## RUDOLPH F. PIERCE vs. CARNEICE G. PIERCE.

Middlesex. September 8, 2009. - November 9, 2009.

Present: SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Divorce and Separation,* Modification of judgment, Alimony, Findings. *Retirement.*

Review of the evolution of the law of alimony, which is wholly statutory, and discussion of the factors that a judge must take into consideration in making an award of alimony (or a modification of an award) and the balance that a judge must strike when financial resources are inadequate to maintain the marital standard of living. [293-298]

In an action brought in the Probate and Family Court to modify a judgment of divorce nisi, in which the husband, who wished to retire at the age of sixty-five, sought elimination of the award of alimony, the judge, in reducing but not terminating the award, was warranted in finding that the wife could not meet her financial needs without alimony, and did not abuse her discretion in ruling that the fair balance of sacrifice meant that the wife must adapt her life-style to cope with a reduction in alimony and that the husband must continue to pay the reduced amount [298-304]; however, where the judge erred in failing to make specific findings of fact to support her decision not to modify the divorce judgment retroactively with respect to alimony that she found was due but had not yet been paid at the time the husband served his complaint for modification, this court remanded the matter for further proceedings [304-306].

COMPLAINT for divorce filed in the Middlesex Division of the Probate and Family Court Department on August 12, 1998.

A complaint for modification, filed on August 24, 2007, was heard by *Leilah A. Keamy*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Anthony M. Doniger* (*Susan A. Hartnett* with him) for Rudolph F. Pierce.

*David E. Cherny* (*Mark T. Smith* with him) for Carneice G. Pierce.

The following submitted briefs for amici curiae:

*Rachel B. Biscardi* for Women's Bar Association of Massachusetts & another.

*Edward M. Ginsburg, Christina L. Paradiso, & Katie M. Perry* for Legal Assistance Corporation of Central Massachusetts.

*John Foskett, Thomas J. Barbar, & Fern L. Frolin* for American Academy of Matrimonial Lawyers, Massachusetts Chapter.

GANTS, J. The plaintiff, Rudolph F. Pierce, was married to the defendant, Carneice G. Pierce, for thirty-two years until their divorce on August 26, 1999. As part of their separation agreement, which was merged in relevant part with the judgment of divorce nisi (divorce judgment), Rudolph was required to pay Carneice $110,000 per year as alimony for her support and maintenance.[1] In March, 2008, at the age of sixty-five, Rudolph voluntarily retired as a partner at the law firm where he had practiced and became "of counsel" to the firm. In April, 2008, he filed a motion in the Probate and Family Court to amend his earlier complaint for modification of the divorce judgment, asking the court to eliminate his alimony obligation to Carneice because of his retirement. After an evidentiary hearing, the judge allowed Rudolph's complaint for modification to the extent that the judge reduced the amount of the alimony to $42,000 per year. Rudolph now appeals from the modification of the divorce judgment, contending that the judge abused her discretion by failing to terminate Rudolph's alimony obligation. Rudolph also appeals from the judge's failure to grant a retroactive reduction in alimony for calendar year 2007, in view of the significant decline in his earned income that year resulting from his gradual withdrawal from active employment.

We granted Rudolph's application for direct appellate review to consider whether a former spouse's voluntary retirement from employment at or beyond the customary age of sixty-five should create a rebuttable presumption under the statutes governing the award of alimony (G. L. c. 208, §§ 34, 37) that any alimony obligation owed by the retiring spouse should be terminated. We conclude that the statutes and interpretative case law governing the determination of the amount of alimony do not reasonably permit such a presumption. Instead, we hold that voluntary retirement at a customary age is simply one factor, albeit an important one, to be considered by the judge in deciding whether to modify the alimony obligation set forth in a divorce judgment. We con-

---

[1] In the interest of clarity, we use the first names of the parties. See *Bercume* v. *Bercume*, 428 Mass. 635, 636 n.1 (1999).

clude that the judge did not abuse her discretion in finding that a reduction in the amount of alimony, but not a termination of alimony, was warranted in view of the totality of the circumstances, which in this case included not only Rudolph's age and wish to retire but also Carneice's recent loss of employment and desire to postpone her application for Social Security benefits until she became eligible for full retirement benefits.

We further hold that the judge erred in failing to make specific findings of fact to support her decision not to modify the divorce judgment retroactively with respect to alimony that she found was due in 2007 but had not yet been paid at the time Rudolph served his complaint for modification. We therefore remand this case to the judge for further proceedings consistent with our ruling.[2]

*Background.* We summarize the relevant facts as found by the judge and as stipulated by the parties, supplemented where necessary by undisputed evidence in the record. Rudolph and Carneice were married in 1967 and divorced on August 26, 1999. At the time of the divorce, Rudolph was fifty-seven years of age and Carneice was age fifty-five. At the time of the judge's ruling on the complaint seeking to terminate alimony, Rudolph was sixty-six years of age and Carneice, sixty-four. They have two children from their marriage, both of whom are emancipated. Both parties are in good health for their respective ages and physically able to work in their respective fields of employment.

Rudolph began practicing law in 1970. He became a United States Magistrate Judge in 1976 and an Associate Justice of the Massachusetts Superior Court in 1979. He returned to the private practice of law in 1985 and, in 1987, became a partner in a Boston-based law firm, where he remained until his voluntary retirement on March 31, 2008. During his years in private practice, Rudolph enjoyed a successful career as a trial lawyer, specializing in civil litigation and "white collar" criminal defense. Following the 1999 divorce, he remarried and moved with his wife in 2004 to the Washington, D.C., area, where he became the lone litigation attorney in his firm's Washington, D.C., office.

---

[2]We acknowledge the amicus briefs filed by the American Academy of Matrimonial Lawyers, Massachusetts Chapter; the Legal Assistance Corporation of Central Massachusetts; and the Women's Bar Association of Massachusetts and the Women's Bar Foundation of Massachusetts.

At the time of the divorce judgment, Rudolph earned approximately $450,000 as a partner at his law firm. After receiving between $500,000 and $570,000 in total compensation from the law firm for each of its fiscal years between 1999 and 2006, his compensation dropped to $300,000 in 2007.[3] When he voluntarily retired from the law firm in 2008 at the age of sixty-five, he had been earning a salary of $225,000 per year. By converting to retired "of counsel" status, Rudolph relinquished any regular, fixed annual compensation, but continued to receive medical insurance and long-term care insurance. He would also receive $250 per hour for any case work he performed. In July, 2008, he began receiving full Social Security benefits totaling approximately $24,000 per year. At the time of the judge's ruling, Rudolph reported annual income of approximately $34,000, consisting of Social Security income, dividends, interest, and "one-time" income; he had assets of approximately $1.3 million and no significant debt. The judge found that among Rudolph's assets was a retirement account valued at approximately $843,000, which, she concluded, would provide him with unearned income of at least $40,000 when he chose to access these funds. Rudolph's current wife is employed and earns $125,000 annually.

During her marriage to Rudolph, Carneice was the primary caretaker for the parties' two children and the marital home. For twenty-seven years of her marriage, Carneice was employed by an international computer corporation, but at the time of the divorce, she had left her position there and was working as a development officer for an international charitable organization. In August, 2007, when the complaint for modification was filed, she was employed as a fundraiser for a national nonprofit organization, where she earned $95,000 annually. In June, 2008, Carneice's employer informed her that her position had been restructured and that she would be required to cover a larger territory, increase her travel, and assume more duties without any increase in salary. After explaining that she could not take on the increased travel and other responsibilities because of her age and physical condition, Carneice resigned her position. She received no severance payment. At the time of the judge's ruling, she was

---

[3]In 2006, Rudolph changed his employment status with the law firm, converting from an equity partner who received a share of the firm's net profits to a salaried contract employee.

looking for, but had not yet found, new employment. She also had applied for unemployment benefits but had yet to learn whether she was eligible for such benefits. Because she was unemployed and received neither Social Security nor unemployment benefits, at the time of the judge's ruling, Carneice reported current total annual income of under $1,000, all from interest and dividends. She had nearly $600,000 in bank and money market accounts, plus an IRA retirement account valued at approximately $292,000. Including these accounts and the real estate she owned, her total assets were approximately $1,248,000; offsetting this, she had mortgages and other debts of approximately $325,000. Carneice intended to find employment and postpone retirement for two years, at which time she would become eligible for full Social Security benefits.

At the time of the 1999 divorce, the parties entered into a separation agreement, negotiated by experienced divorce counsel, which, with respect to all terms governing the payment of alimony, merged into the divorce judgment. The separation agreement made an equal division of marital property between the parties.[4] Under the terms of the agreement, Rudolph was obligated to pay Carneice alimony for her support and maintenance in the amount of $110,000 annually for an indefinite period; the agreement provided for termination of the payments only on the death of Rudolph, or on the death or remarriage of Carneice, whichever came earlier. Payment was to be made in two parts: (1) regular payments in the amount of $2,000 on the first and the fifteenth of each month, totaling $48,000 annually; and (2) the balance of $62,000 "in approximately four yearly installments to be paid at a time and in an amount to coincide with cash payments [Rudolph] receives from his employer . . . . In any event, the entire sum of [$62,000] is to be paid in full no later than December 31st of each year."

Neither party sought modification to the terms of the divorce

---

[4]Under the division of marital assets reached in the separation agreement, Carneice received ownership of the marital home, certain small retirement accounts held in her own name, and a portion of the substantial retirement assets held in Rudolph's name. The retirement assets transferred from Rudolph to Carneice totaled approximately $409,000 at the time of transfer. At the time of the August 13, 2008, modification hearing, the total value of Carneice's retirement assets had declined to $296,600. Carneice testified that this decline was attributable to poor investment decisions by a professional advisor.

judgment until Rudolph filed a complaint for modification in August, 2007, seeking to reduce the amount of his alimony obligation in connection with his gradual withdrawal from active employment with his law firm. In February, 2008, Carneice filed a complaint for contempt after Rudolph failed to pay the $62,000 balance due under the divorce judgment for the calendar year 2007.

On March 17, 2008, the judge found that, under the terms of the separation agreement, Rudolph owed and was required to pay Carneice $41,107, which represented, in the judge's calculation, the prorated portion of the annual $62,000 payment attributable to the period from January 1, 2007, to the date Rudolph served the complaint for modification on Carneice — August 31, 2007. The judge ruled that, even if a modification of Rudolph's alimony obligation were allowed, the modification would not apply to amounts due prior to the service of the complaint for modification.[5]

In April, 2008, Rudolph moved to amend his complaint for modification, asserting that, because he had retired completely from the practice of law and therefore was without earned income, his alimony obligation should be terminated and his alimony obligation for 2007 retroactively should be reduced. On May 2, 2008, Carneice moved to amend her complaint for contempt, claiming that Rudolph had stopped making bimonthly alimony payments of $2,000 as required by the divorce judgment.

At the August 13, 2008, hearing on the consolidated complaints for modification and contempt, the judge heard the testimony of both Rudolph and Carneice. On September 16, 2008, in her twenty-four page decision, the judge considered, among other factors, the current income, assets, and liabilities of the parties, their financial needs, Rudolph's financial support of his mother and his wife's financial support of their household, and the opportunities available to each of the parties to acquire future income and assets. The judge concluded that it was appropriate to reduce Rudolph's obligation to pay alimony under the divorce judgment from $110,000 per year to $42,000 per year, retroactive to April 1, 2008, but not appropriate to terminate that obligation altogether. That same date, the judge entered judgment on Carneice's complaint for contempt by finding Rudolph not

---

[5]Rudolph moved for reconsideration of this order on April 10, 2008; the motion was denied on April 22, 2008.

guilty of contempt. The judge did not modify her earlier judgment obliging Rudolph to pay Carneice the prorated amount of $41,107 for the first eight months of 2007.

The judge recognized that "there may be insufficient income" for each party to enjoy the standard of living they had enjoyed during their marriage, "particularly as they now approach their retirement years." However, the judge found that Rudolph had not reduced his standard of living after his retirement and, "based on his significant assets, it appears he will continue to have a similar lifestyle to that when he was employed." In contrast, the judge found that Carneice had insufficient income to meet her financial needs and could not do so without continued financial support from Rudolph. In summary, the judge acknowledged that "retirement is something due every individual at some point in life," but found that "the facts and circumstances presented in this matter demonstrate an ongoing need for support on behalf of Carneice in addition to what she can continue to earn until her own retirement."

The judge found that Rudolph had the present financial ability to pay the reduced amount of alimony, despite his diminished income. The judge noted that Rudolph was receiving Social Security benefits of approximately $24,000 per year, that his retirement assets, assuming a rate of return of five per cent, should provide him with an unearned income of approximately $40,000 per year, and that Rudolph's wife was paying many of the couple's bills from her annual salary of $125,000. The judge also found that, despite his retirement, Rudolph continued to have "significant earning power." As "of counsel" to his law firm, Rudolph had a continuing ability to earn income through part time, hourly legal work that would pay him $250 per hour. She also found that his extensive judicial and legal experience allowed him to obtain employment at one of the Washington, D.C., law schools.[6]

The judge noted that, even though Rudolph was fifty-seven years of age when he entered into the separation agreement with Carneice and "must certainly have been aware that his retirement was on the horizon," the agreement provided that alimony would continue until Carneice's remarriage or the death

_____

[6]Rudolph testified that he was unsuccessful in his application to teach at one Washington, D.C., law school.

of either party. The judge declared that the terms of the agreement must bear on any resolution of the issues before her: "This provision is clear and unambiguous as to the parties' desire for when support should cease, and retirement is not among the list. Therefore, even if the parties' agreement of August 26, 1999 is to be modified, the parties' original desires and purposes should not be disregarded."

*Discussion.* "To be successful in an action to modify a judgment for alimony or child support, the petitioner must demonstrate a material change of circumstances since the entry of the earlier judgment." *Schuler* v. *Schuler*, 382 Mass. 366, 368 (1981). Here, Rudolph was successful in modifying the divorce judgment with respect to his alimony obligation, but he did not succeed in terminating that obligation. In considering Rudolph's appeal from the modification judgment, we recognize that a judge enjoys considerable discretion in fashioning an appropriate modification judgment, and that the judgment may not be reversed in the absence of an abuse of discretion. See *Ross* v. *Ross*, 385 Mass. 30, 37 (1982); *Greenberg* v. *Greenberg*, 68 Mass. App. Ct. 344, 347-348 (2007). Because every modification judgment requires findings of fact, conclusions of law, and the exercise of discretion, our inquiry on review requires careful consideration of the facts and circumstances of an individual case. We examine (1) whether the factual findings are "clearly erroneous," giving "due regard . . . to the opportunity of the trial court to judge of the credibility of the witnesses," Mass. R. Dom. Rel. P. 52 (a) (2008); (2) whether there were errors of law; and (3) whether the judge appears to have based her decision not on sound discretion, but "on whimsy, caprice, or arbitrary or idiosyncratic notions." *Bucchiere* v. *New England Tel. & Tel. Co.*, 396 Mass. 639, 642 (1986). The standard of review reflects substantial, but not unlimited, deference to the judge who saw the witnesses and heard the evidence. See *Boulter-Hedley* v. *Boulter*, 429 Mass. 808, 811 (1999).

1. Before considering whether the judge abused her discretion by failing to terminate Rudolph's alimony obligation, we first briefly review the law of divorce and alimony as it has evolved in the Commonwealth. There is no common-law authority in Massachusetts for a court to grant a divorce or award alimony. "The court's power to award alimony and make an equit-

able division of property is wholly statutory.'"[7] *Heins* v. *Ledis*, 422 Mass. 477, 480 (1996). See *Gottsegen* v. *Gottsegen*, 397 Mass. 617, 621-622 (1986). See also *Davol* v. *Davol*, 13 Mass. 264, 264-265 (1816) (judicial authority to award alimony originates only in statute, not under common law). In the Eighteenth Century, under the Colonial government of Massachusetts, divorce could be granted only by the Governor or the Governor's Council or through a special legislative Court of Assistants, to which the Colonial Legislature delegated authority to hear divorces. See C.P. Kindregan, Jr., & M.L. Inker, Family Law and Practice §§ 1:2, 1:5 (3d ed. 2002). See also *Gottsegen* v. *Gottsegen*, *supra* at 621. The Massachusetts Constitution, adopted in 1780, provided that all causes of marriage, divorce, and alimony were to "be heard and determined by the governor and council, until the legislature shall, by law, make other provision." Part II, c. 3, art. 5, of the Constitution of the Commonwealth. In 1785, the Legislature made other provision, enacting comprehensive legislation regulating marriage and divorce and granting jurisdiction over these matters to the courts of the Commonwealth. St. 1785, c. 69, § 7. See *Gottsegen* v. *Gottsegen*, *supra* at 621-622. Consequently, in matters of divorce and alimony, the role of the judiciary is to interpret the governing statutes, not to fashion its own solutions under the common law. See *School Comm. of Lowell* v. *Mayor of Lowell*, 265 Mass. 353, 356-357 (1928). See also 3 N.J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 57.17 (3d ed. 2008).

The contemporary statutory provisions governing property division and alimony on divorce in Massachusetts date from 1974, when the Legislature dramatically revised the law by granting courts the ability to award alimony to either a husband

---

[7] In England, judicial authority over matrimonial matters was vested exclusively in the ecclesiastical courts, applying canon law. While these courts would, in certain circumstances, recognize legal separation and award alimony as a form of economic support, they refused as a rule to recognize the formal dissolution of a marriage. Beginning in the late Seventeenth Century, a narrow, alternative route to divorce developed for well-situated litigants able to secure formal divorce by way of a special act of Parliament. This remained the governing scheme under English law until 1857, when jurisdiction for divorce was transferred to the civil court system and divorce was formally authorized in circumstances of adultery. See H.H. Clark, Jr., Domestic Relations in the United States § 13.1, at 696 (2d ed. 1987). See also *Gottsegen* v. *Gottsegen*, 397 Mass. 617, 621 (1986).

or a wife, according to need, and to make a division of property
by awarding either spouse's property to the other. See St. 1974,
c. 565; *Heins* v. *Ledis, supra* (explaining legislative purpose
behind revision of statutory scheme for awarding alimony). See
also Inker, Alimony and Assignment of Property: The New
Statutory Scheme in Massachusetts, 10 Suffolk U.L. Rev. 1, 4
(1975). Also new to the statutory scheme, and of immediate rele-
vance to our inquiry, was the introduction by St. 1974, c. 565, of
a detailed inventory of factors that a court must consider in mak-
ing any division of property or award of alimony.[8] These factors
have remained unchanged since their introduction. General Laws
c. 208, § 34, provides:

> "In determining the amount of alimony, if any, to be
> paid, or in fixing the nature and value of the property, if
> any, to be so assigned, the court . . . shall consider the
> length of the marriage, the conduct of the parties during
> the marriage, the age, health, station, occupation, amount
> and sources of income, vocational skills, employability,
> estate, liabilities and needs of each of the parties and the
> opportunity of each for future acquisition of capital assets
> and income."

A court must consider these same factors in determining whether
the amount of alimony should be modified based on a change
of circumstances following entry of an earlier judgment for
alimony. See G. L. c. 208, § 37 (allowing court to modify ali-
mony judgment and "make any judgment relative thereto which
it might have made in the original action").[9] See also *Gottsegen*
v. *Gottsegen, supra* at 625.

In conducting this multifactor analysis, whether in fashioning
the original alimony judgment or in modifying that judgment, the
judge must weigh *all* the statutory factors in light of the facts of

---

[8]Prior to the 1974 legislative revision, G. L. (Ter. Ed.) c. 208, § 34, had pro-
vided simply: "Upon a divorce, or upon petition at any time after a divorce, the
court may decree alimony to the wife, or a part of her estate, in the nature of
alimony, to the husband."

[9]A complaint for modification must be based on a change of circumstances
occurring after the earlier alimony judgment, because "the issue ought not be
*relitigated* unless there has been a change of circumstances" (emphasis in
original). *Cherrington* v. *Cherrington*, 404 Mass. 267, 270 (1989). See *Schuler*
v. *Schuler*, 382 Mass. 366, 368 (1981).

the particular case; no single factor is determinative. See *Gottsegen* v. *Gottsegen, supra* at 623; *Ross* v. *Ross*, 385 Mass. 30, 35 (1982). "The weight to be accorded each of the § 34 factors in a particular case is committed to the judge." *Id.* at 37, quoting *Langerman* v. *Langerman*, 9 Mass. App. Ct. 869, 870 (1980). While the judge must consider and weigh all the factors, she must keep in mind that "the statutory authority of a court to award alimony continues to be grounded in the recipient spouse's need for support and the supporting spouse's ability to pay." *Gottsegen* v. *Gottsegen, supra* at 624.

If a supporting spouse has the ability to pay, the recipient spouse's need for support is generally the amount needed to allow that spouse to maintain the lifestyle he or she enjoyed prior to termination of the marriage. "The standard of need is measured by the 'station' of the parties — by what is required to maintain a standard of living comparable to the one enjoyed during the marriage." *Grubert* v. *Grubert*, 20 Mass. App. Ct. 811, 819 (1985), citing *Rice* v. *Rice*, 372 Mass. 398, 402 (1977). See also *Kittridge* v. *Kittridge*, 441 Mass. 28, 44 (2004); *Greenberg* v. *Greenberg*, 68 Mass. App. Ct. 344, 346-347 (2007). When, however, the supporting spouse does not have the ability to pay, the recipient spouse "does not have an absolute right to live a lifestyle to which he or she has been accustomed in a marriage to the detriment of the provider spouse." *Heins* v. *Ledis*, 422 Mass. 477, 484 (1996). The judge must consider all the statutory factors and reach a fair balance of sacrifice between the former spouses when financial resources are inadequate to maintain the marital standard of living. See *id.*; *Greenberg* v. *Greenberg, supra.*

The judge's task in arriving at a fair balance, a complex calculus in any circumstance, becomes more complicated when a party's actual earnings are substantially less than the party's potential earning capacity. This can occur when a party who can work full time works part time or chooses employment that is more satisfying, but less lucrative, than the party's skills and education may permit. The provider spouse's payment obligation depends on both parties' incomes, so the cost of either party's choice of less lucrative work — or no work at all — is always, in part, shifted to the other. See American Law Institute's Principles of the Law of Family Dissolution: Analysis and Recommendations § 5.03(c)

(2002). Because the statutory factors include age, health, vocational skills, employability, and opportunity for future income, see G. L. c. 208, § 34, in addressing this situation "[a] judge is not limited to a party's actual earnings but may in the proper circumstances consider potential earning capacity." *Heins* v. *Ledis, supra* at 485. See *Schuler* v. *Schuler*, 382 Mass. 366, 374 (1981) ("where the support provider is earning less than he could with reasonable effort, the trial judge may consider potential earning capacity rather than actual earnings"). A judge, however, is not obligated to use a party's potential earning capacity as the measure of the party's ability to pay. "Where a support provider makes . . . a good faith voluntary . . . career change, courts asked to reduce the rate of alimony or support payments frequently consider the moving party's actual income rather than his potential income in evaluating his ability to pay." *Id.* at 373. Much remains committed to the judge's discretion, as in other considerations of alimony.

In determining a fair balance of sacrifice between the parties, the judge may credit that the support provider has good faith, persuasive reasons for selecting employment paying less than his or her potential earning capacity. People often prefer careers that may not maximize their lifetime income, and divorce should not entirely deprive an individual of this freedom. But these considerations must be balanced against a provider's obligation to support the former spouse. *Id.* at 372. Thus, in *Schuler* v. *Schuler, supra* at 371-372 & n.6, we found that it was within the probate judge's discretion to conclude that it was unreasonable for a former spouse charged with the financial support of his former wife and children to continue indefinitely to earn a negligible income through consulting work in the hope of becoming president of a small corporation when a substantially higher-paying salaried position was reasonably available to him. At the same time, we also recognized in that opinion that, in appropriate circumstances, "a good faith career change resulting in lowered income may warrant a reduction of alimony." *Id.* at 373.

A support provider's retirement from employment is a career change that, depending on the support provider's age, health, and occupation, may constitute a voluntary, good faith career change that will justify a probate judge's decision to rely on the support provider's actual, rather than potential, income in decid-

ing whether (and by how much) to modify an alimony judgment. Yet, even in the context of a good faith retirement, a judge must reach a fair balance of sacrifice between the parties, based on all the factors set forth in G. L. c. 208, § 34. This may mean that overriding or counterbalancing needs of the recipient spouse require the judge to consider the retiring party's continued earning capacity (assuming the party remains in good health) in deciding the motion for modification, even if the practical consequence of considering continued earning capacity is to delay the support provider's retirement or to require the provider to find part-time employment. See *Huddleston* v. *Huddleston*, 51 Mass. App. Ct. 563, 570-571 (2001) (former husband's retirement at age sixty-five not by itself sufficient basis for terminating alimony). Just as a support provider will naturally ask himself whether *he* or *she* can afford now to retire or to reduce his or her workload to part-time employment, a judge deciding a complaint to modify an alimony judgment must ask whether the supporting spouse *and* the recipient spouse can afford the supporting spouse's retirement at that time.[10] If the answer is, "No," the judge in her discretion must determine a fair balance of sacrifice between the wants and needs of the two parties.[11] This may include ensuring that the supporting spouse is willing to assume an appropriate portion of the shared financial burden that will result from his or her decision to retire.

2. Here, the judge was required to grapple with this dilemma in arriving at her judgment. At age sixty-five, Rudolph had retired

[10]In the clear-eyed observation of one court, a former spouse's ongoing need for financial support is a continuing limitation on a supporting spouse's freedom to retire, write poetry, or take a vow of poverty: "The reason for this is that the duty of self-fulfillment must give way to the pre-existing duty which runs between spouses who have been in a marriage which has failed." *Deegan* v. *Deegan*, 254 N.J. Super. 350, 358-359 (App. Div. 1992). See *Bassette* v. *Bartolucci*, 38 Mass. App. Ct. 732, 735-736 (1995).

[11]When balancing a support provider's wish to retire against a recipient spouse's continuing financial need, the judge must consider all the statutory criteria in G. L. c. 208, § 34, as they relate to *both* parties, not simply the party seeking a reduction in the alimony judgment. See *Heins* v. *Ledis*, 422 Mass. 477, 485 (1996) (judge must consider recipient spouse's potential earning power when determining appropriateness of alimony); *Talbot* v. *Talbot*, 13 Mass. App. Ct. 456, 456-458 (1982) (reversing dismissal of complaint for alimony brought by former spouse in part for failure to consider effect of chronic mental illness on that spouse's employability and opportunity for acquisition of assets in future).

after a long and successful career in the law. In doing so, he forswore the $225,000 in compensation he was scheduled to earn in 2008 as a partner at his law firm and substituted for it only Social Security income in the amount of approximately $24,000 per year. In large part because his wife continued to work and contribute to the household expenses, Rudolph could afford to maintain his marital life style, provide ongoing financial support for his mother, and postpone any withdrawals from his retirement funds, at least until his wife's anticipated retirement. The timing of Rudolph's decline in income, however, could not have come at a worse time for Carneice. The judge was permitted to credit Carneice's testimony that, at age sixty-four, she could not physically handle the expanded territory her employer wished to assign her, with its additional travel requirements, and continue to manage her other work responsibilities.[12] In short, at the time of the hearing, Carneice was unemployed, without either severance or unemployment benefits, and not yet eligible for full Social Security benefits. The judge was warranted in finding that she could not meet her financial needs without alimony.[13]

The judge was also warranted in finding that Rudolph maintained an "of counsel" relationship to his law firm, was physically able to work part time as an attorney, and would be paid $250 per hour for such work. While the record does not identify any clients who would continue to retain him or any significant cases that required his involvement, the judge, in view of Rudolph's education and extensive experience as a civil trial lawyer,

---

[12]The judge found that Carneice's territory had spanned from Maine to Delaware but that her employer wanted her to add the Plains and Mountain States. She testified that she was already traveling two weeks of every month; the additional territory would have necessitated even more travel, at greater distances.

[13]We acknowledge that the record did not support the judge's finding that Rudolph's retirement assets conservatively would yield a rate of return of five per cent, and note that the judge did not impute income to Carneice based on a comparable rate of return from either her retirement assets ($292,000) or her liquid savings ($597,000). We conclude, however, that even if the judge had assumed a more modest rate of return and imputed income from Carneice's retirement and liquid savings based on that same rate of return, Carneice would still not be able to meet her financial needs without alimony. Because the judge did not articulate any formula that she used to determine the modified amount of alimony, and because we conclude that the modified amount was within the range that was reasonable under the circumstances, we do not conclude that the judge abused her discretion despite these unsupported factual findings.

United States Magistrate Judge, and Massachusetts Superior Court judge, was not plainly wrong in finding that he could continue to perform part-time legal work for his law firm.[14]

The judge did not abuse her discretion in ruling that the fair balance of sacrifice in this case meant that Carneice, in view of Rudolph's wish to retire at the age of sixty-five, must adapt her life style to cope with a sixty-two per cent reduction in alimony (from $110,000 per year to $42,000 per year), and that Rudolph must continue to pay this reduced amount, even if that requires him to find part-time legal work at his law firm, withdraw retirement income earlier than he had hoped, or modify his life style. We note that, if Rudolph billed only 200 hours per year on case work at his law firm, he could earn $50,000, more than enough to pay all his alimony.[15]

Rudolph asks this court to tilt the balance of sacrifice in his favor by declaring a rebuttable presumption that all alimony should be terminated when (1) the supporting spouse retires from employment at a customary retirement age and has no actual earned income, (2) the parties' marital assets, including their retirement assets, had been equally divided at the divorce, and (3) the parties have the same amount of liquid assets at the time of the provider spouse's retirement. Rudolph contends that this presumption should be rebuttable only on a showing of extraordinary circumstances compelling continued payment of alimony.

We agree that, generally, a supporting spouse's wish to retire at a customary retirement age will justify a reduction of the alimony award, even if the consequence is that the recipient spouse may be unable to sustain a lifestyle equal to that enjoyed during the marriage. See *Schuler* v. *Schuler*, 382 Mass. 366, 370-371 (1981)

---

[14]The judge also found that Rudolph "should be a highly desirable candidate to teach full or part-time at any of the greater Washington, D.C. law schools." While the record supports her finding that he "should be a desirable candidate," it does not support the conclusion that he had any reasonable prospect of obtaining full or part-time employment as a law professor, or that he would earn a substantial salary if he worked part time as an adjunct professor.

[15]The amount in alimony paid by a provider spouse is deducted from gross income under Federal and Massachusetts tax law, so income taxes on such income are paid by the recipient spouse, not the provider spouse. See I.R.C. §§ 71, 215 (2006); C.P. Kindregan, Jr., & M.L. Inker, Family Law and Practice § 38:13 (3d ed. 2002) (G. L. c. 62, § 2, adopts Federal definition of gross income, so alimony may also be deducted from gross income on Massachusetts tax return).

("A substantial and permanent decrease in the income of the support provider is one of the material circumstances to be considered in a request for reduction of a support [award]"). We also agree that, generally, if the parties' marital assets, including their retirement assets, have been equally divided at the divorce, and the parties have approximately the same amount of liquid assets at the time of the provider spouse's retirement, a judge should be reluctant to include the continued earning capacity of a supporting spouse who retires at a customary age in calculating a modified alimony award, unless the failure to do so would cause substantial financial hardship to the recipient spouse. In short, we agree that an alimony award that, for all practical purposes, requires a supporting spouse who wants to retire to continue to work beyond the customary retirement age imposes a considerable burden on that spouse that must be carefully weighed in reaching a fair balance of sacrifice. We also recognize that, even when a fair balance requires a supporting spouse to postpone retirement or to work part time, that balance (and the alimony award that emerges from such balancing) will and should change over time consistent with changes in the support provider's age, health, and employability (and perhaps the recipient spouse's eligibility for full Social Security and retirement benefits).

We decline, however, to create the rebuttable presumption proposed by Rudolph, which would discard the multi-factor analysis required under G. L. c. 208, § 34, and embodied in our case law and replace it with a rule that, in the absence of extraordinary circumstances, would prohibit a judge from considering the continued earning capacity of a supporting spouse who retires at a customary retirement age. The multiple factors set forth in G. L. c. 208, § 34, and the obligation of a judge deciding an alimony judgment to consider *all* the factors, including "the opportunity of each [party] for future acquisition of . . . income," reflect the complexity of the alimony decision, the unique set of circumstances posed by every case, and the need to fashion an alimony judgment that imposes a fair balance of sacrifice in each case. Section 34 does not place any one of its mandatory considerations above any other; constrained by its directives, we have declined to do so on our own. G. L. c. 208, § 34. See *Gottsegen* v. *Gottsegen*, 397 Mass. 617, 623-624 (1986).[16]

---

[16]We have created only one presumption as to alimony: unless otherwise

We also do not agree that the age of the supporting spouse, taken in isolation, should always be the most significant factor in a judge's evaluation of alimony. Under the proposed standard, a support provider's terminal illness or involuntary job loss would be granted substantially less weight in a judge's ruling on a modification complaint than the support provider's voluntary decision to retire from active employment at the customary age, even though the former two circumstances lie outside his or her control and pose a more severe and potentially irreversible threat to the support provider's long-term ability to pay.

By seeking this rebuttable presumption, Rudolph essentially aims to ensure through a rule of law that his alimony obligation will terminate when he retires, even though no such provision was included within the separation agreement, which declares that alimony terminates only on Rudolph's death, or the death or remarriage of Carneice. Even where, as here, the separation agreement's provisions regarding alimony are merged into and do not survive the divorce judgment, "it is nevertheless appropriate for a judge to take heed of the parties' own attempts to negotiate terms mutually acceptable to them." *Bercume* v. *Bercume*, 428 Mass. 635, 644 (1999). See *Greenberg* v. *Greenberg*, 68 Mass. App. Ct. 344, 353 (2007) (declining to terminate alimony obligation on husband's retirement where separation agreement had provided for continuation until husband's death); *Huddleston* v. *Huddleston*, 51 Mass. App. Ct. 563, 567-568 (2001) (reversing termination of alimony obligations on supporting spouse's attainment of age of sixty-five when merged separation agreement between parties expressed contrary intent). If Rudolph had wanted

provided in the divorce judgment or the parties' agreement, the remarriage of the recipient spouse is presumed to terminate the supporting spouse's obligation to pay alimony, absent "some extraordinary circumstances, established by the recipient spouse, warranting its continuation." *Keller* v. *O'Brien*, 420 Mass. 820, 826-827 (1995). In creating this presumption, we reasoned that, on the recipient spouse's remarriage, the new spouse assumes a duty to support the recipient spouse, so that, except in extraordinary circumstances, it is neither logical nor reasonable for the spouse to receive support from a current spouse and a former spouse at the same time. *Id.* at 828. Otherwise stated, by remarrying, the recipient spouse makes "an election between the support provided by the alimony award and the legal obligation of support embodied in the new marital relationship." *Id.*, quoting *Voyles* v. *Voyles*, 644 P.2d 847, 849 (Alaska 1982). The recipient spouse makes no such election when the supporting spouse decides to retire, and therefore equitably should not be expected to bear the entire brunt of that decision.

his alimony obligation to end on his retirement, he could have negotiated such a provision in the separation agreement, which might have affected the division of marital property and the amount of alimony to be paid between divorce and retirement.

We are confirmed in our unwillingness to adopt the rebuttable presumption proposed by Rudolph by the absence of case authority for such a rule in other jurisdictions. Even the cases relied on by Rudolph and the amicus brief filed by the Massachusetts Chapter of the American Academy of Matrimonial Lawyers do not declare any such presumption. See *In re Marriage of Reynolds*, 63 Cal. App. 4th 1373 (1998); *In re Marriage of Swing*, 194 P.3d 498 (Colo. Ct. App. 2008); *Pimm* v. *Pimm*, 601 So. 2d 534 (Fla. 1992). In *In re Marriage of Reynolds*, *supra* at 1379, the California court declared, "Just as a married couple may expect a reduction in income due to retirement, a divorced spouse cannot expect to receive the same high level of support after the supporting spouse retires." Consequently, the court held that "no one may be compelled to work after the usual retirement age of [sixty-five] in order to pay the same level of spousal support as when he was employed." *Id.* at 1378.[17] In *In re Marriage of Swing*, *supra*, the Colorado court adopted what it characterized as the "majority rule" that "reduced income due to a spouse's objectively reasonable decision to retire, made in good faith and not with the intention of depriving the other spouse of support, should be recognized as a basis for modifying maintenance." *Id.* at 501. In *Pimm* v. *Pimm*, *supra* at 535, the Florida court simply held that the postjudgment retirement of the provider spouse *may* be considered, together with other relevant factors and relevant law, in determining a petition to modify the alimony. The court added that the needs of the recipient spouse and the financial impact on that spouse of a modification or termination of alimony are among the relevant circumstances a court may consider in deciding a modification petition, along with any relevant provision contained

---

[17]The California court also held that the trial court could not properly attribute to the retired husband a monthly income based on his earning capacity rather than his actual earnings, thereby requiring him to work well past the age of sixty-five. *In re Marriage of Reynolds*, 63 Cal. App. 4th 1373, 1377 (1998). The significance of this holding, however, is limited by the fact that the court found that there was no evidence in the record that the husband had any actual ability to work or that he had refused any actual jobs. *Id.* at 1378.

in an earlier agreement between the parties. *Id.* at 537.[18] None of these assertions is inconsistent with this opinion.

Finally, Rudolph argues that, unless we create a rebuttable presumption to benefit the supporting spouse, the recipient spouse will hold effective veto power over the provider spouse's retirement decision, potentially denying the provider spouse the opportunity ever to retire. Our decision grants the recipient spouse no such veto. Every supporting spouse is permitted to retire, and an alimony judgment based on the supporting spouse's earned income eventually will need to be reduced or terminated to reflect the supporting spouse's diminished actual income after retirement. The supporting spouse, however, is not entitled unilaterally to retire regardless of the financial hardship such retirement may cause the recipient spouse. In appropriate circumstances, as here, the supporting spouse, even after reaching a customary retirement age, in the sound discretion of the probate judge, may be expected temporarily to postpone retirement or to find part-time work to help the recipient spouse weather difficult financial circumstances.

3. Beyond his challenge to the judge's award of continuing alimony in her ruling on his complaint for modification, Rudolph appeals from the judge's March 17, 2008, order directing him to make payment of $41,107 to Carneice. This sum represents the judge's calculation of the pro rata share of the $62,000 component of his 2007 alimony obligation for the period from January 1, 2007, to August 31, 2007, the date Rudolph served on Carneice his initial complaint for modification.[19]

The judge's order rests on two conclusions, one express and the other implicit. The express conclusion followed from the judge's interpretation of a term of the parties' 1999 separation agreement, which was merged with the divorce judgment, that required Rudolph, in addition to making bi-monthly alimony payments of $2,000, to pay Carneice each year:

---

[18]Rudolph focuses on the Florida court's acknowledgment that age sixty-five is the conventionally accepted age for retirement, but the court acknowledged this convention only for the purpose of concluding that a party wishing to retire *before* the age of sixty-five would have a heavy burden to show his or her retirement is reasonable. See *Pimm* v. *Pimm*, 601 So. 2d 534, 537 (Fla. 1992).

[19]The September 16, 2008, judgments on Rudolph's complaint for modification and Carneice's complaint for contempt did not modify this order.

"The sum of Sixty-Two Thousand ($62,000.00) Dollars in approximately four yearly installments to be paid at a time and in an amount to coincide with cash payments the Husband receives from his employer, [the law firm]. In any event, the entire sum of Sixty-Two Thousand ($62,000.00) Dollars is to be paid in full no later than December 31st of each year."

The judge found that this language clearly means that the $62,000 component of alimony became progressively due over the course of the year, and therefore was properly allocable on a pro rata basis to a period of less than twelve months. The judge then found that the sum of $41,107 had been due and payable as of August 31, 2007.[20] The implicit conclusion underlying the judge's order is that any retroactive modification to Rudolph's 2007 alimony obligation that may arise from Rudolph's complaint for modification could not apply to unpaid sums that were "due and payable" as of August 31, 2007.

In reaching her express conclusion, the judge relied solely on what she found was the "clear and unequivocal" language of the agreement to reject Rudolph's argument that, because the anticipated quarterly payments from his employer ceased when his employment status changed in 2006 from an equity partner to a salaried employee, no part of the $62,000 annual obligation could be due and payable under the agreement until December 31, 2007. We conclude that the language of the separation agreement is not so clear and unequivocal as to permit the judge to reach this conclusion without considering parol evidence as to the purpose and intent of the parties in adopting this provision. See *Robert Indus., Inc.* v. *Spence*, 362 Mass. 751, 753-754 (1973).

We also conclude that the judge erred in her implicit conclusion that a judge may not reduce or eliminate an alimony obligation that is due and payable, but in arrears, in a judgment of modification. Probate judges "have full power and authority under [G. L. c. 208, § 37,] to modify [judgments] for alimony entered in divorce proceedings not only as to the future, but also as to arrears." *Watts* v. *Watts*, 314 Mass. 129, 133 (1943). See *Binder* v. *Binder*, 7 Mass. App. Ct. 751, 760 (1979) ("A Probate

---

[20]The judge calculated the amount due as follows: $62,000 divided by 365 days multiplied by 242 days (period from January 1, 2007, to August 31, 2007) equals $41,107.

Court has the power to reduce the alimony provisions of its divorce judgment retroactively, as well as prospectively . . .").[21,22] Because a judge has authority to modify alimony payments due in arrears, a decision *not* to make a modification, such as the judge reached in her order, constitutes an exercise of discretion under G. L. c. 208, § 37. While such a decision clearly rests within the scope of a judge's discretion, it cannot be reached without findings reflecting her consideration of all the factors mandated by G. L. c. 208, § 34. The same is true with any decision regarding the amount of alimony. See *Gottsegen* v. *Gottsegen*, 397 Mass. 617, 623-624 (1986). The judge here made no such findings, and the record does not otherwise reflect that she considered all the § 34 factors in denying retrospective relief.

For these reasons, we vacate that part of the judge's March 17, 2008, order directing Rudolph to make payment of $41,107 to Carneice and remand this case so that the judge (1) may consider parol evidence and make findings as to the interpretation of the payment provisions in the separation agreement, and (2) may exercise her sound discretion, supported by findings of fact and a statement of reasons, as to whether Rudolph is entitled to retrospective relief regarding his alimony obligation for the period from January 1, 2007, to August 31, 2007.

*Conclusion.* We affirm the judgment on Rudolph's complaint for modification, dated September 16, 2008. We vacate that part of the order dated March 17, 2008, that directed Rudolph to pay Carneice the amount of $41,107, which the judge found was due and payable for the period from January 1, 2007, through August 31, 2007, and remand the case to the Probate and Family Court for further proceedings consistent with this opinion.

*So ordered.*

---

[21] A judgment for alimony differs in this regard from a judgment for child support. Under G. L. c. 119A, § 13 (*a*), an order for child support is not subject to modification for any period prior to the date that notice of a complaint for modification has been served. *Smith-Clarke* v. *Clarke*, 44 Mass. App. Ct. 404, 405-406 (1998).

[22] Because the judge may issue retrospective relief as to alimony payments, she has the authority to provide such relief even if, on remand, she were again to find that $41,107 had been due and payable as of August 31, 2007.