NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-136

KAYLA ST. GEORGE

vs.

STEWART BURLINGAME.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from an October 29, 2021, modification judgment issued by a judge of the Probate and Family Court insofar as the judge denied her request for joint legal custody of the parties' minor child. We affirm.

Background. We summarize the facts as the judge found them, supplemented by undisputed evidence from the trial, reserving certain facts for later discussion. See Pierce v. Pierce, 455 Mass. 286, 288 (2009). The parties were never married and have one child together, born May 7, 2014. A judgment entered in November 2016 granting the father sole legal and physical custody of the child and allowing the mother supervised visits with her.[1] The mother had a history of

---

[1] The father has since married and has another child from that marriage; the mother has another child of whom she has custody.

substance use, but by 2018 the mother was free of illegal drugs,[2] had obtained an apartment, and was working.  On March 12, 2018, the parties entered a stipulated judgment (2018 judgment) granting the mother a dinner visit one night per week, and a visit on Saturday from 5 P.M. to 7 P.M.  The stipulation also contained provisions for holidays.

The mother maintained her sobriety, apartment, and job. She also successfully completed a drug court program through the District Court.[3]  Accordingly, in September 2018 the parties reached an informal, verbal agreement that increased the mother's parenting time to two dinners per week and visits every other weekend.  In July 2020, an incident at the child's gymnastics recital led the father to rescind the informal

---

The father, his wife, and child live with the paternal grandmother.

[2] The mother was prescribed suboxone and held a medical marijuana card.  The clinical supervisor of the program who oversaw the mother's suboxone use testified that the mother had been undergoing drug testing through her program since at least 2017 and had consistently tested negative for illicit drugs.  She was aware that the mother sometimes used marijuana.  The mother testified that she used marijuana products to manage stress. The mother's clinical supervisor testified that she had never seen the mother "sedated or impaired," but based on a lack of adequate clinical research on potential interactions between marijuana and suboxone, could not testify about the risk, if any, associated with the overlapping use of those drugs.

[3] At trial, the mother introduced a letter of support from the presiding justice of the drug court in which she participated. In his letter, the judge noted that the mother not only completed the program but acted as a mentor and role model for other participants.

agreement. The mother, who understood that the gymnastics facility's COVID-19 protocols limited the child to a single guest at the facility itself, was watching the event via Zoom when she saw not only the father, but also the father's wife and mother in physical attendance at the event. In response, the mother became disproportionately angry, and immediately drove from her home to the gymnastics facility. As the children and parents were escorted to the facility's lobby at the conclusion of the event, there was an altercation between the mother and the family group, including the father. According to a staff member credited by the judge, the mother yelled aggressively, flailed her arms, and called the father a "scumbag." The confrontation continued in the parking lot, where the mother blocked the father's car in with her car, got out, and began "screaming and swearing" at the father, drawing the attention of other children and their guests. The mother subsequently "screeched" out of the parking lot. The incident left the child in tears. The following day, the father had a no-trespass order served on the mother.[4]

In August 2020, the mother filed a complaint for modification of the 2018 judgment; on September 17, 2020, she

---

[4] At some point prior to trial in April 2022, however, once the mother "had calmed down," the informal arrangement made in September 2018 was reinstated by the father.

3

filed the amended complaint for modification at issue in this appeal (amended complaint).  In the mother's amended complaint, she sought joint legal and physical custody of the child based on, among other alleged changes in circumstance, the mother's graduation from drug court and continued sobriety, and the May 2020 closure of a pending case brought by the Department of Children and Families (DCF) involving the mother and child.  The trial was held over three days on October 4, 5, and 18, 2021, where the judge heard from six witnesses.

Based on the trial evidence, the judge concluded that, while the mother had "taken positive steps" by obtaining work and an apartment, and in maintaining her sobriety, she did not recognize the impact of her earlier failures to do so on the child.  Additionally, the judge concluded that the parents' continued inability to communicate directly about the child and the mother's "lack of impulse control," as highlighted by her conduct at the gymnastics event, indicated that she was still unable to put the child's interests first.  Ultimately, the judge concluded that it was not in the child's best interests to grant joint custody.  The judge did, however, acknowledge the mother's progress by formalizing the portion of the parties' 2018 verbal agreement that provided the mother with expanded parenting time.

The mother appeals from the posttrial judgment.  As we explain, we do not agree that the judge committed any reversible error.

Discussion.  1.  Standard of review.  To obtain a custody modification, the requesting party "must first establish that a material and substantial change in circumstance has occurred to warrant a change in custody, and that the change is in the child's best interests."  E.K. v. S.C., 97 Mass. App. Ct. 403, 408 (2020).

> "When determining . . . modifications of custody awards based on changed circumstances, the guiding principle always has been the best interests of the children. . . . The decision of which parent will promote a child's best interests is a subject peculiarly within the discretion of the judge.  Discretion allows the judge when determining the best interests of children, to consider the widest range of permissible evidence, including the reports and testimony of a court appointed investigator or [guardian ad litem], evidence of the history of the relationship between the child and each parent, evidence of each parent's present home environment and over-all fitness to further the child's best interests, and the judge's own impressions upon interviewing the child privately in chambers" (quotation omitted).[5]

Loebel v. Loebel, 77 Mass. App. Ct. 740, 747 (2010), quoting Ardizoni v. Raymond, 40 Mass. App. Ct. 734, 738 (1996).

"In reviewing a modification judgment, we examine whether the factual and legal bases for the decision are in error, or

---

[5] In this case, there was no guardian ad litem appointed and the judge was neither asked to interview the child in chambers nor did so sua sponte.

5

whether the judge otherwise abused his discretion." Flor v. Flor, 92 Mass. App. Ct. 360, 363 (2017). "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses" (citation omitted). J.S. v. C.C. 454 Mass. 652, 657 (2009).

2. Child's best interests. The mother argues that the judge erred in denying her amended complaint insofar as he denied joint custody. In our assessment of the record as a whole, there was no abuse of discretion in the judge's conclusion. We recognize, as did the judge, that at the time of trial, the mother had been sober[6] for approximately six years, was working, and had an apartment. We assume that the judge concluded that the mother's continued success in recovery for the three years between the 2018 judgment and her complaint for modification was a "change in circumstances" for the purposes of the mother's request. Even so, there was no abuse of discretion in the judge's refusal to grant joint custody of the child to the mother where the judge found that at the time of trial, (1) the parents remained unable to get along and (2) as a result, joint custody was not then in the child's best interests. See

---

[6] We are aware that the mother used suboxone and marijuana while in recovery, but as nothing suggests that mother ever abused either of those drugs, we consider it appropriate to refer to the mother as "sober."

6

Smith v. McDonald, 458 Mass. 540, 547 (2010) (trial judge has "considerable freedom to identify pertinent factors in assessing the welfare of the child and weigh them as [he or] she sees fit"). We are not persuaded that the judge's conclusion was the result of unfair bias against the mother, or that to the extent the judge erred in his findings, that the errors required reversal.

The judge's determination that the parents could not "communicate and plan with each other concerning the child's best interests," G. L. c. 209C, § 10 (a), was amply supported by the evidence. We consider this aspect of the judge's decision with particular care, aware that there was evidence (which the judge did not specifically discredit) to support the conclusion that the father bore at least some responsibility for the parties' history of poor communications. At trial, there was evidence before the judge that the parenting time exchanges took place not at the parties' homes, but at the Charlton police station, and that the parties relied almost exclusively on the paternal grandmother and the father's wife to communicate with each other about even routine matters. These facts, coupled with the evidence described above about the public incident at the child's gymnastics event, supported the judge's decision. See Mason v. Coleman, 447 Mass. 177, 182 (2006) (joint custody appropriate "only if the parties demonstrate an ability and

7

desire to cooperate amicably and communicate with one another to raise the children").  Additionally, where the mother's testimony about the event diverged sharply in all important details from the evidence the judge credited, the judge's findings include his implicit conclusion that the mother either lied about her conduct or was unable to perceive the events of that day accurately.  Although we are mindful that a single instance of the mother's poor judgment -- even a dramatic one -- might not be dispositive of whether joint custody would be in the child's best interests, a judgment granting joint custody requires an affirmative finding of the parties' ability "to communicate and cooperate concerning major decisions affecting [the child]."  In re Odette, 61 Mass. App. Ct. 904, 905 (2004), citing G. L. c. 209C, § 10 (a).  To be successful, such an arrangement requires not only both parents' interest in doing what is best for the child -- and here, there is no question but that both parents want what is best for their child -- but also the ability to work together in an amicable way to achieve that goal, even when there is conflict or a parent's patience is tried.  See Mason, 447 Mass. at 182.  In the circumstances of this case, we cannot say that the judge abused his discretion in concluding that the mother had failed to carry her burden on the issue.

To the extent that the mother takes issue with the judge's rationale, her challenges are primarily to the judge's assessments of the weight and credibility of the evidence, assessments to which we defer. See J.S., 454 Mass. at 656 ("The determination of which parent will promote a child's best interests rests within the discretion of the [trial] judge" [citation omitted]). "Absent clear error, we will not substitute our weighing of the evidence for that of a trial judge who had the opportunity to observe the witnesses and form conclusions about their credibility, even if our weighing of the evidence might have differed from that of the judge." A.H. v. M.P., 447 Mass. 828, 838 (2006).

Although the mother challenges a handful of the judge's factual findings as clearly erroneous, to the extent we agree, we conclude that the errors were not significant to the judge's decision. Notably, while we agree that the evidence at trial was that the mother consumed marijuana "gumm[ies]," and did not "smok[e]" it, as the judge found, and that another witness, and not the paternal grandmother, testified that the mother yelled during the gymnastics incident, the judge's decision did not turn on the erroneous details. The judge's findings that the mother used marijuana products for stress and that the mother yelled in a way that visibly upset the child were not clearly erroneous and to the extent the judge relied on them, his doing

9

so was not improper.  We are not persuaded that reversal is required in these circumstances.[7]  See Care & Protection of Olga, 57 Mass. App. Ct. 821, 825 (2003) (decision affirmed where erroneous findings not central to ultimate conclusion).

Our conclusion that the judge did not abuse his discretion does not undermine our recognition of the significant strides the mother has made in recovery, the amount of hard work the mother has devoted to her recovery, her love for her child, and the importance of her progress in recovery to the continuing relationship between the mother and the child.  Nor does our current determination, or that of the trial judge, preclude the possibility of shared custody in the future, should communication between the parties improve.

3.  Evidentiary rulings.  a.  Text messages.  On the first day of trial, the mother's counsel proffered as a trial exhibit a series of text messages between the mother and others, including the paternal grandmother.  The father's counsel

---

[7] Although on the bare transcript, the basis for the judge's finding that the mother treats the father and his family with "disdain" is not immediately apparent, we recognize that the trial judge not only heard the testimony of the witnesses, but also saw their demeanor and interaction during the trial.  He thus "had the unrivaled benefit of observing the parties at close hand, with the commensurate ability to evaluate their credibility, in light not only of their testimony but also of their demeanor in court."  Ginsberg v. Blacker, 67 Mass. App. Ct. 139, 147-148 (2006).  In any event, we discern no clear error in this finding.

10

objected on the grounds that, contrary to the judge's order that the parties disclose their exhibits several days in advance of trial, the mother had not disclosed the texts -- which numbered in "[the] hundreds" -- until 6:30 P.M. on the previous day. Counsel for the mother conceded that she was in possession of the text messages at issue prior to trial but did not disclose them to opposing counsel because she had been occupied by overlapping family matters, one of which she characterized as "an emergency." The judge explained that, in keeping with his pretrial order from April 29, 2021, he would not admit any exhibits that had not been marked and exchanged prior to trial.[8] Given the mother's failure to comply with the pretrial order, the judge was within his discretion in ruling that the text messages could not be used for substantive purposes. See Kace v. Liang, 472 Mass. 630, 637 (2015) (recognizing judge's "broad discretion" to admit or exclude evidence "the proponent has not given proper notice of" [quotation and citation omitted]).

The judge did permit the mother's counsel to use the text messages to refresh witness recollection during the trial, and she did so when the paternal grandmother testified that she had

_____

[8] The father's attorney consented to certain text messages being entered as exhibits. Additionally, the judge permitted the mother to use the text messages for the nonsubstantive purpose of refreshing the paternal grandmother's recollection, which she did.

11

no present memory of sending messages to the mother suggesting that she would help the mother obtain custody of the child. When some of those attempts to refresh the witness's memory failed, the mother's attorney sought to use the text messages to impeach the witness. The father's counsel objected on the grounds that the paternal grandmother had been called as a witness by the mother, and "she can't impeach her own witness." The judge sustained the objection.

While the judge was incorrect in stating that the mother could not impeach her own witness, see Mass. G. Evid. §§ 607 & 613 (a) (1) (2022), the error was not a basis for reversal because the mother was not prejudiced by it here. G. L. c. 231, § 119. This is because, the challenged ruling notwithstanding, the paternal grandmother was impeached with the text messages. The paternal grandmother initially denied that she "had [ever had] a conversation with [the father] about [the] mother getting custody." Mother's counsel then presented her with text messages between herself and the mother; in response, the paternal grandmother recanted her denial by admitting, "I may have said that to him more than one time out of anger. . . . More than one time out of anger, I'm sure." The statement came in without objection. Where the judge heard the witness acknowledge the prior inconsistent statement and the mother's counsel stressed the discrepancy, we are satisfied that the

12

mother was not prejudiced by the erroneous ruling.  See

Commonwealth v. Martin, 19 Mass. App. Ct. 117, 120 (1984)

(failure to instruct on impeachment by prior inconsistent

statements harmless where defense counsel thoroughly brought

fact-finder's attention to inconsistencies).[9]

We discern no error in the judge's refusal to categorize

the paternal grandmother as a hostile witness during the

mother's examination.  "The 'decision whether to allow leading

questions [is] left for the most part to the wisdom and

discretion of the trial judge.'"  Commonwealth v. Ridge, 455

Mass. 307, 326 (2009), quoting Commonwealth v. Flynn, 362 Mass.

455, 467 (1972).  Although a parent's bias in favor of his or

her own child -- here, the father -- could be of concern in a

modification trial, that assessment was for the trial judge to

make.  We are satisfied that the judge was within his discretion

in refusing to label the paternal grandmother as adverse

considering her generally neutral testimony.[10]

---

[9] There was no abuse of discretion in the judge's rulings on mother's offers of proof in light of the foregoing discussion, because an offer of proof is not necessary where the context is clear.  See Commonwealth v. Donovan, 17 Mass. App. Ct. 83, 88 (1983).  Even if it were error, there is no prejudice based on both the level of context clear to us from the record and the apparent limited impact of the paternal grandmother's impeachment.

[10] The mother urges us to liken the facts of this case to those in Commonwealth v. Bates, 93 Mass. App. Ct. 1117 (2018), an unpublished decision pursuant to our former rule 1:28, wherein we affirmed a judge's decision to label a witness hostile where

4. Duration of trial. The mother further argues that the judge imposed unfair time limits on the trial by forcing her to rest her case once all properly-summonsed witnesses had testified and incorrectly denying her motions for issuance of witness subpoenas on the last day of trial. Neither part of this argument is persuasive. The judge repeatedly warned the attorneys that they should finish their cases within the scheduled trial dates to avoid a serious scheduling delay, but did not foreclose the possibility of scheduling additional trial days if necessary.[11] Early in the trial, the mother's counsel indicated her intention to call the mother's probation officer and a sitting District Court judge as trial witnesses; she did not, however, take the necessary steps to summons or subpoena

_____

the witness provided evasive answers and claimed a lack of memory. Notwithstanding the lack of precedential authority of that decision, it is readily distinguishable. There, we approved of the judge's determination based on the witness's "demeanor, . . . testimony [that day,] and the background in [the] case [of which the judge was] aware," not just the content of the witness's responses. Id. Nothing in the record here suggests that the paternal grandmother's demeanor or background indicated that she was hostile to the mother.

[11] On the first day of trial, the judge warned the attorneys: "Attorneys, this case from what I've seen so far should have been tried in less than a day. You've got two. Finish in two. If you don't, I can't even tell you what the next date you'll get is. My trial dates are far out. Plan accordingly." On the second day of trial, the mother's attorney told the judge she would probably not finish that day, and the judge warned her that the next trial date would not be for about six months.

14

either one of them.[12]  Instead, on the final day of trial, she moved for process to bring the probation officer and judge in for a date to be scheduled in the future.  Where the mother's counsel put forward no reason for her delay in attempting to bring the additional witnesses into court, and where the judge reasonably concluded that allowance of the mother's motions attempting to do so would have created an unreasonable delay in the trial, the judge was within his discretion in denying the motions.[13]  See Beaupre v. Cliff Smith & Assocs., 50 Mass. App. Ct. 480, 485 (2000) (noting "extensive discretion of trial judges with respect to both the process of discovery and the admission of evidence"); Clark v. Clark, 47 Mass. App. Ct. 737, 746 (1999) ("once time limits have been set it becomes the obligation of the judge to ensure that the trial marches forward without the parties engaging in repetitious and irrelevant examination").  Even if the mother had followed a timely process to have the subpoenas issued, the judge would not have abused his discretion in denying the request, because so far as the record shows, the judge's and probation officer's testimony

---

[12] A subpoena to compel a judge or probation officer of the trial court to testify must be accompanied by a court order approving the subpoena.  See Rule 1 of the Uniform Rules on Subpoenas to Court Officials, Rule IX of the Rules of the Trial Court.

[13] We are unpersuaded by mother's citation to Commonwealth v. Conley, 34 Mass. App. Ct. 50, 62 (1993), where problems arose "through no fault of counsel," and the defendant asked only to recess ten minutes early to adjourn for the next scheduled day.

would have been merely cumulative of the information contained in the judge's letter of support introduced as exhibit 7 at trial.

The judge imposed no restrictions on the parties' ability to call witnesses -- other than to follow the proper procedures for doing so -- and did not impose time limits on the examination of any witness. "A judge, as the guiding spirit and controlling mind of the trial, should be able to set reasonable limits on the length of a trial." Clark, 47 Mass. App. Ct. at 746.

To the extent that the mother raises other challenges to the judge's evidentiary rulings, they do not rise to the level of appellate argument, and we do not address them. See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019).

Conclusion. For the foregoing reasons, we conclude that there was no abuse of discretion in the denial of joint custody.

Judgment affirmed.

By the Court (Sullivan, Hand & Walsh, JJ.[14]),

*Joseph F. Stanton*

Clerk

Entered: March 3, 2023.

---

[14] The panelists are listed in order of seniority.

16